# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

|  |  |  |
|---|---|---|
| REGIONS BANK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 4:09-CV-1260 CAS |
| EGYPTIAN CONCRETE CO., and | ) | |
| REGIONS BANK, f/k/a UNION | ) | |
| PLANTERS BANK, NA, f/k/a | ) | |
| FIRST NATIONAL BANK AND TRUST | ) | |
| COMPANY, AS TRUSTEE UNDER | ) | |
| THE PROVISIONS OF A TRUST DATED | ) | |
| THE 5TH DAY OF JULY, 1974, | ) | |
| KNOWN AS TRUST NUMBER LT-1338 | ) | |
| AND NOT INDIVIDUALLY, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on the Motion to Approve the Sale of Certain Assets to County Materials Corporation (the "Sale Approval Motion") filed on behalf of ATEC Liquidations, Inc. d/b/a ATEC, Inc. ("ATEC" or the "Receiver"), in its capacity as the duly appointed receiver for Egyptian Concrete Co. ("Egyptian") and Regions Bank, f/k/a Union Planters Bank, NA, f/k/a First National Bank and Trust Company, as Trustee Under The Provisions of the Trust Dated the 5th Day of July, 1974, Known as Trust Number LT-1338 and Not Individually (hereinafter "Regions Land Trust," Egyptian and Regions Land Trust are collectively referred to as "Defendants"). The Court held a hearing on this matter on November 24, 2009 (the "Sales Hearing"). The parties were granted additional time, until November 30, 2009, to file supplemental authority in support of the motion.

Having considered the evidence presented at or before the Sales Hearing (including, without limitation, the stipulated offer of proof at the Sales Hearing on behalf of the Receiver), the written and oral argument and presentations of counsel made at or before the Hearing, the various pleadings and related documents submitted in this matter, and the record as a whole, the Court makes the following findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.").

## FINDINGS OF FACT

**Background**

Egyptian was in the business of manufacturing and supplying structural prestressed/precast concrete including providing beams and bridges. Egyptian operated facilities in Salem, Illinois, and Bonne Terre, Missouri.

Plaintiff, Regions Bank ("Regions"), provided Egyptian with ongoing financing in the form of standard fixed rate loans, as well as a revolving line of credit. This revolving line of credit was directly tied to the amount of Egyptian's inventory and accounts receivable. In February 2009, Regions discovered that the revolving line of credit to Egyptian was over-advanced by $2.7 Million and thereafter refused to extend further credit to Egyptian.

In February 2009, Egyptian and ATEC signed an agreement whereby ATEC became the Chief Restructuring Officer ("CRO") for Egyptian. Upon assuming the position of CRO, ATEC began inquiring into the marketing efforts that Glennon J. Boresi, President of Egyptian, had made to find new investors or potential buyers for the Company. Mr. Boresi had contacted several producers, investment bankers, private equity firms, suppliers, regional general contractors, and provided a Business Plan and Pro Forma along with other due diligence materials to approximately 40 separate

companies. All of the investors contacted by Mr. Boresi insisted that any sale of the assets would have to be free and clear of all liens, security interests, and other claims.

ATEC began to pursue discussions with CM Acquisitions LLC. n/k/a PECM LLC (the "Initial Bidder") regarding a proposed sale of Egyptian's assets as the Initial Bidder seemed to be the best candidate for purchasing the assets at that time. In addition to seeking new investors or potential buyers for Egyptian's assets, ATEC notified all creditors that all shipments were to be C.O.D., effective immediately.

ATEC initiated discussions with the International Brotherhood of Teamsters Local 50 and the International Brotherhood Local 1197 regarding possible wage concessions and work concessions. The discussions with the unions proved unsuccessful.

As the summer progressed, the financial difficulties suffered by Egyptian adversely impacted its ability to secure new contracts, and the "back log" of work continued to decrease, while the losses from operations continued to increase. In August, 2009, ATEC reviewed the cash forecast and determined an optimal shut down date.

**The Sales Procedure**

On August 7, 2009, Regions commenced the instant action in this Court by filing its Complaint against Egyptian and certain other parties. At the time that Regions filed the Complaint, Egyptian and Regions Land Trust were (and presently remain) owners of certain assets subject to a perfected security interest in favor of Regions.

After filing its Complaint, Regions filed its Second Amended Motion for Appointment of Receiver (the "Receivership Motion"), wherein Regions requested that this Court appoint ATEC as the Receiver for Egyptian. In support of this appointment, Regions cited the fact that ATEC had

been functioning as the CRO of Egyptian since February 2009 and was, therefore, knowledgeable of Egyptian's business functions and practices.

On September 1, 2009, this Court entered its Order Appointing Receiver (the "Original Receivership Order"), pursuant to which it granted the Receivership Motion and appointed ATEC as the Receiver for Egyptian. Within ten days of the entry of the Original Receivership Order, the Receiver caused copies of the Original Receivership Order and the Complaint to be filed in the district court of all districts in which the Defendants' Assets are located, including the United States District Court for the Southern District of Illinois.

On September 22, 2009, Regions filed its First Amended Complaint (the "First Amended Complaint"), wherein Regions added Regions Land Trust as an additional Defendant in this action. Egyptian is the beneficial interest holder of the Regions Land Trust. In conjunction with its First Amended Complaint, Regions also filed its Motion for Entry of Amended Order Appointing Receiver (the "Amended Receivership Motion"), wherein it asked this Court to also appoint ATEC as the Receiver for Regions Land Trust. On September 24, 2009, this Court entered its Amended Order Appointing Receiver (the "Amended Receivership Order"), wherein the Court amended its Original Receivership Order and appointed ATEC as the Receiver of Regions Land Trust as well as Egyptian. Within ten days of the entry of the Amended Receivership Order, the Receiver caused copies of the Amended Receivership Order and the First Amended Complaint to be filed in the district court of all districts in which the Defendants' Assets are located, including the United States District Court for the Southern District of Illinois.

On September 29, 2009, the Receiver filed its Receiver's Motion to Approve Procedure for the Private Sale of Assets, or, Alternatively to Approve Procedure for Public Sale, seeking approval

of a procedure for the private sale of Defendants' assets or, alternatively, to approve a procedure for a public sale of these assets. The Receiver's proposed sale includes the following real estate and personalty of Defendants (collectively, the "Acquired Assets"):

(1) The Salem Facility located at 749 West Commercial, Salem, IL 62881. This includes the "CEC parcel" which will be transferred to Egyptian from its wholly owned subsidiary, Concrete Equipment Corporation ("CEC"). The CEC parcel is contiguous to the property that comprises the Salem Facility owned by Egyptian.

(2) The Bonne Terre Facility located at 409 Benham St., Bonne Terre, MO 63628.

(3) Concrete plants, rolling stock, equipment, personal property, inventory (other than finished goods inventory), intellectual property, intangible assets, certain contracts and licenses, records, transferable permits and certain prepaid assets of Defendants.

Although it denied the Receiver's proposed private sale of the assets, the Court later approved the public sale of the same Assets. See Order entered on October 15, 2009 (Docket No. 25)(the "Public Sale Order"). In its Public Sale Order, the Court approved the sales procedure (collectively, the "Sale Procedures") proposed in Paragraph 27 of the Receiver's Motion to Approve the Public Sale of Assets (the "Public Sale Motion"). Specifically, these Sales Procedure provided for the following:

(1) **Notice**: In accordance with 28 U.S.C. §2002, the Receiver was to publish notice of the sale once a week for four weeks in a newspaper of general circulation, specifically the *Centralia Sentinel* and the *Daily News Journal*, and provide actual notice to the creditors of Defendants and all companies and individuals who have previously expressed interest in acquiring some or all of Defendants' Assets. The Notice was to state in effect that any party wishing to make an offer for the Assets must (i) submit to the Receiver at such hearing in writing a *bona fide* and binding offer to purchase the Assets; and (ii) demonstrate at such hearing, to the satisfaction of the Receiver, that it has the current ability to consummate the purchase of the Assets per the agreed terms. Any

bidder satisfying the foregoing requirements was to be designated as a "Qualified Bidder."

(2) **Bid Requirements**: A bid was a letter from a Qualified Bidder stating whereby: (i) the Bidder offered to purchase the assets sought to be acquired upon the terms and conditions set forth in a copy of the Asset Purchase Agreement, marked to show those amendments and modifications to the Asset Purchase Agreement, including price and terms, that the Qualified Bidder proposed (the "Marked Agreement") and (ii) the Bidder's offer was irrevocable until forty-eight (48) hours after the closing. A Bidder was required to accompany its bid with: (i) a certified check in the amount of $450,000 (the "Good Faith Deposit") of the Purchase Price payable to the order of the Receiver; and (ii) written evidence of financial ability to consummate the transaction.

The Receiver was to consider a bid only if the bid:

(a) Provided for a Purchase Price of at least ten-percent (10%) over the Initial Bid;

(b) Was on terms that, in the Receiver's business judgment, were not materially more burdensome or conditional than the terms of the Asset Purchase Agreement (the "APA") between the Receiver and the Initial Bidder;

(c) Was not conditioned on obtaining financing or on unperformed due diligence by the bidder with respect to the Assets, but could be subject to the accuracy in all material respects at the closing of specified representations and warranties or the satisfaction in all material respects of specified conditions, none of which could be materially more burdensome than those set forth in the APA; and

(d) Did not request or entitle the bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment.

A bid received from a Qualified Bidder that met the above requirements was a "Qualified Bid." For these purposes, the APA executed by the Initial Bidder was deemed to constitute a Qualified

Bid.

(3) **Bid Deadlines**: A Qualified Bidder making a bid was required to bring three written copies of its bid to the Auction and present the bid to the Receiver's counsel.

(4) **Determination of the Receiver**: The Receiver was to (i) determine whether any person is a Qualified Bidder, (ii) coordinate the efforts of Qualified Bidders in conducting their respective due diligence investigations regarding the Assets, (iii) receive offers from Qualified Bidders, and (iv) negotiate any offer made to purchase the Assets (the "Procedure"). Any person who wished to participate in the Procedure had to be a Qualified Bidder. The Receiver was not be obligated to furnish any information of any kind whatsoever relating to the Receiver or Defendants to any person who was not a Qualified Bidder.

(5) **"As Is, Where Is"**: The sale of the Assets it to be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Receiver or Defendants; their agents or their estate, except to the extent set forth in the Asset Purchase Agreement (or a mark-up of the same), as the case may be. All of Defendants' right, title and interest in and to respective assets shall be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon (collectively, the "Transferred Liens"), such Transferred Liens to attach to the net proceeds of the sale of such assets.

(6) **Modifications**: The Receiver would be permitted to: (i) determine, in its business judgment, which Qualified Bid, if any, is the highest or otherwise best offer; and (ii) reject at any time before entry of an order of the District Court approving a Qualified Bid any bid that, in the Receiver's sole discretion, is (a) inadequate or insufficient, (b) not in conformity with the terms and conditions of sale, or (c) contrary to the best interests of the receivership estate and its creditors.

(7) **Return of Good Faith Deposit**: The Good Faith Deposit of all Qualified Bidders are to be retained by the Receiver and all Qualified Bids will remain open, notwithstanding the District Court's approval of a sale pursuant to the terms of a Successful Bid by a Qualified Bidder, until forty-eight (48) hours after the

closing of the transaction. The Receiver will then return any Good Faith Deposit to the appropriate Qualified Bidder.

(8) **Acceptance of Qualified Bids**: The Receiver agreed to sell the Assets to the presenter of the highest or otherwise best Qualified Bid received, whether received from the Initial Bidder or another Qualified Bidder. The Receiver would be deemed to have accepted a bid only when the bid has been approved by the District Court at the Sales Hearing.

(9) **Auction**: The auction was to be held at the Salem Facility on a date set by the Receiver but no earlier than four weeks from the Court's approval of the Sales Procedure to allow the Receiver sufficient time to publish its notice. After all Qualified Bids were received, the Receiver would conduct an auction (the "Auction") with respect to the Acquired Assets. Only Qualified Bidders who submitted Qualified Bids were eligible to participate at the Auction. At the Auction, Qualified Bidders would be permitted to increase their bids. The bidding shall was to start at the purchase price stated in the highest Qualified Bid and continue in increments of at least fifty-thousand dollars ($50,000.00).

Upon conclusion of the Auction, the Receiver would: (i) review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the sale with respect to such Assets and (ii) identify the highest and best offer for the Assets (the "Successful Bid").

If only the Initial Bidder appears at the hearing, an auction of the Assets was not to be held. Instead, the Initial Bid would be presented to the District Court for approval at the Sales Hearing.

**(10)** **The Sales Hearing:** The Receiver was to seek entry of an order, *inter alia*, approving and confirming the sale of the Acquired Assets: (i) if no other Qualified Bid were received, to the Initial Bidder pursuant to the terms and conditions set forth in the APA, or (ii) after a public auction, if another Qualified Bid is received by the Receiver, to the Initial Bidder or such other Qualified Bidder as the Receiver, in the exercise of its business judgment may determine to be the Successful Bid. If this Court rejects the Successful Bid, the Receiver may, in its discretion, decide to present to the Court the next highest Qualified Bid.

The Court approved the foregoing Sales Procedure pursuant to its Public Sale Order, wherein the Court specifically made the following findings (which said findings are expressly incorporated herein by reference):

> After consideration of the Receiver's Motion, the Court finds that pursuant to 28 U.S.C. §§ 2001, 2002, and 2004, the Receiver's sale of defendants' assets (as defined in Paragraphs 19 and 20 of the Receiver's Motion) will conserve the Receivership Estate and is, accordingly, in the best interest of the Receivership Estate. Furthermore, the sales procedure described in Paragraph 27 of the Receiver's Motion is fair and reasonable and will permit the Receiver to conduct an orderly sale to obtain the best offer on the best possible terms for the assets. The sales procedure will ensure all bids will be comparable by requiring all bids to be on substantially the same terms and conditions.

The Receiver has complied fully with the Sales Procedure and Notice requirements approved by this Court. Thus, the Receiver caused the approved notice of the public sale of Defendants' Acquired Assets to be published for the requisite period of time in the Daily Journal, a newspaper of general circulation in Bonne Terre, Missouri, and the Morning Sentinel, a newspaper of general circulation in Salem, Illinois. Prior to the Auction, the Receiver's counsel also caused the approved notice to be sent to all of Defendants' known creditors and all individuals and companies who expressed an interest in acquiring some or all of Defendants' Acquired Assets.

In accordance with the Sales Procedure, the Receiver deemed two parties qualified to purchase Defendants' Acquired Assets at the public sale. Specifically, the Initial Bidder and County Materials Corporation ("County Materials") were the sole bidders that met the requirements of the Sales Procedure.

**The Public Auction**

On November 17, 2009, the Receiver conducted the Auction in accordance with the Sales Procedure. At the Auction, the Initial Bidder and County Materials exchanged a series of bids in accordance with the Sales Procedures, culminating in the bid of County Materials of $4,100,000.00, plus ninety-percent of all "raw" "closing inventory," as those terms are defined in the Asset Purchase Agreement (the "Final Bid"). County Materials' Final Bid was $1,570,000.00 higher than the "Initial Bid" of the Initial Bidder.

After reviewing each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the sale with respect to such Acquired Assets being sold, the Receiver declared County Materials' Final Bid to be the Successful Bid. Following the foregoing declaration, the Receiver and County Materials entered into an Asset Purchase Agreement incorporating the Final Bid (the "Final APA").

On November 18, 2009, the Receiver's counsel served via first class mail, postage prepaid on all known creditors of the Defendants, written notice (the "Supplemental Sale Notice"), notifying such parties of: (1) the Receiver's Sale Approval Motion and the Receiver's request therein that the Court approve the Receiver's proposed sale of the Acquired Assets to County Materials free and clear of all security interests, liens, claims and encumbrances of any of any kind or nature; and (2) the need to object to the Sale Approval Motion on or before the Sales Hearing if they opposed the following relief. A true and accurate copy of the Supplemental Sale Notice is attached as Exhibit 5 to the Receiver's Sale Approval Motion. The Court has received by letter two objections to the Sale Approval Motion from creditors who were owed $5,145.53 and $11,209.73, respectively. A separate

party appeared at the Sales Hearing to object, but indicated to this Court that it did not oppose the relief requested in the Sale Approval Motion.

## CONCLUSIONS OF LAW

The Receiver has been duly appointed the receiver of the Defendants' Assets, including the Acquired Assets specified in the Final APA. In accordance with the provisions of 28 U.S.C. §754, the Receiver has been vested with complete jurisdiction and control of the Acquired Assets and, subject to the approval of the Court, has authority to sell such Acquired Assets to a third party purchaser such as County Materials. See, e.g., S.E.C. v. American Capital Investments Co., 98 F.3d 1133,1144 (9th Cir. 1996)(emphasis in original)(pursuant to 28 U.S.C. §754, a receiver is "vested with *complete* jurisdiction and control of all such property" and selling such property is simply an exercise of that control).

Pursuant to the provisions of 28 U.S.C. §§2001 and 2004, this Court has express authority to authorize the Receiver to sell the Acquired Assets by public sale to a third party such as County Materials. Moreover, it has long been recognized that under appropriate circumstances, a federal court presiding over a receivership may authorize the assets of the receivership to be sold free and clear of liens and related claims. See, e.g, Mellen v. Moline Malleable Iron Works, 131 U.S. 352, 357 (1889)( "the removal of alleged liens or incumbrances upon property, the closing up of affairs of insolvent corporations, and the administration and distribution of trust funds, are subjects over which courts of equity have general jurisdiction."); see also D. Abney, *Selling Equity Receivership Property Free and Clear of Liens and Encumbrances*, 16 Real Prop. L. J. 364, 365 (1988) (noting broad case law and scholarly support for the rule that a federal court "may order the sale of equity receivership property free and clear of liens and encumbrances under the appropriate

circumstances."); Annotation, *Power of Court to Authorize or Direct Receiver (or Trustee in Bankruptcy) to Sell Property Free from Liens*, 35 A.L.R. 255 (1925), updated by 78 A.L.R. 458 (1932) and 120 A.L.R. 921 (1939, with supplement through 2008).

The Receiver caused notice of the public sale of the Acquired Assets approved by this Court to be published in accordance with the provisions of the 28 U.S.C. §2002. All aspects of the Receiver's public sale of the Acquired Assets (including, without limitation, the Auction) were conducted in a commercially reasonably manner.

The Receiver's decision to market and sell the Acquired Assets, both realty and personalty, as a single, inseverable package was consistent with the best interests of the receivership estate. The sale of the Acquired Assets to County Materials pursuant to the Final APA is in the best interest of the receivership estate and will enable the Receiver to maximize the recovery to be realized from the Defendants' Assets.

The Final APA constitutes an arms-length transactions by and between the Receiver and County Materials that fully complies with the approved Sales Procedure. The purchase price to be paid by County Materials to the Receiver under the Final APA represents "reasonably equivalent value" and "full and fair consideration" for the Acquired Assets.

By virtue of purchasing the Acquired Assets from the Receiver pursuant to the Final APA, County Materials has purchased the assets free of liens, security interests, and claims previously attached to those assets, and is, therefore, not be a "successor" of either of the Defendants.

Pursuant to the Sale Procedures and the Supplement Sale Notice, all holders of Transferred Liens and other creditors of the Defendants have been provided notice in conformity with the requirements of 28 U.S.C. §2002 and had opportunity to object to the Receiver's proposed sale of

the Acquired Assets to County Materials free and clear of Transferred Liens. Accordingly, the requirements of the statute having been met, good cause exists for authorizing the sale of the Acquired Assets from the Receiver to County Materials pursuant to the terms of the agreement reached by the parties in the Asset Purchase Agreement.

Accordingly,

**IT IS HEREBY ORDERED** that:

1. The Receiver's Sale Approval Motion is granted and the sale of the Acquired Assets from the Receiver to County Materials pursuant to the Final APA is approved in all respects. [Doc. 34]

2. The Receiver is authorized to undertake any and all actions necessary and appropriate to close and otherwise consummate the transactions provided for under the Final APA.

3. County Materials' acquisition of the Acquired Assets shall be free and clear of any and all Transferred Liens, which such Transferred Liens shall attach to the sale proceeds paid by County Materials to the Receiver in accordance with the Final APA.

_____
**CHARLES A. SHAW**
**UNITED STATES DISTRICT JUDGE**

Dated this 1st day of December, 2009.